# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1193 | **DATE** | 11/15/2004 |
| **CASE TITLE** | Trejo vs. Village of Itasca, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Opinion, Defendant's Motion for Summary Judgment is DENIED with respect to Count I of Plaintiff's Complaint, and GRANTED with respect to Counts II, III, IV, V, and VI. Status hearing set for November 23, 2004 at 9:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | NOV 1 6 2004 date docketed | | |
| ✓ | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TBK | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE DIAZ TREJO, )
)
Plaintiff, )
)
v. ) No. 02 C 1193
)
) Judge Mark Filip
VILLAGE OF ITASCA, )
OFFICER JACK PEARSON, and )
UNKNOWN OFFICERS, )
)
Defendants. )

**DOCKETED**

NOV 1 6 2004

## MEMORANDUM OPINION AND ORDER

Jose Diaz Trejo ("Trejo" or "Plaintiff") brings this action against the Village of Itasca as a

municipal entity and Itasca Police Officer Jack Pearson (collectively "Defendants"). Plaintiff has

filed a six-count amended complaint (D.E. 22) that alleges excessive force against Defendants in

violation of 42 U.S.C. § 1983 ("Section 1983") (Count I), state law assault and battery (Count II),

state law malicious prosecution (Count III), false arrest/unlawful seizure pursuant to Section

1983 (Count IV), state law *respondeat superior* (Count V), and state law indemnification (Count

VI). Defendants have previously advanced several of the arguments opposing the state law

claims in 2003 and 2004 in motions to dismiss. This Court rejected the 2004 motion largely on

the grounds that Defendants advanced the bulk of their arguments in a procedurally improper

manner and that many of Defendants' arguments potentially implicated factual issues and

therefore were more properly resolved in the summary judgment setting. *See Trejo v. Village of*

*Itasca*, No. 02-C-1193 (N.D. Ill. Apr 15, 2004) (Filip, J.) (D.E. 47). Defendants have now

moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. As explained



below, Defendants' motion is granted in part and denied in part.[1]

## I.    FACTS[2]

Defendant Village of Itasca is an Illinois municipal corporation organized under the

Illinois municipal code. (Defendants' Statement of Undisputed Facts ("Def. SF") ¶¶ 1-2.)

Defendant Jack Pearson is a police officer employed by Itasca and has been trained at the Police

Academy and through a variety of continuing education seminars throughout his time as a police

officer. (*Id.* ¶ 2, 56.) Plaintiff is a 55-year-old resident of Itasca. (*Id.* ¶ 3.)

For the sake of clarity, the recitation of the facts occurs in two parts. Part A discusses the

relevant facts which relate to Plaintiff's arrest on March 7, 2000. Part B discusses the procedural

---

[1] At the time Trejo filed the operative Amended Complaint, Trejo and his attorney also designated unknown/John Doe officers of the Itasca Police Department as putative defendants. As this Court explained in its opinion of June 1, 2004 (D.E. 60), Trejo's subsequent attempt to file a Second Amended Complaint (D.E. 31) naming actual Itasca Police Officers in lieu of the "John Doe" defendants was improper under settled Seventh Circuit precedent. *See id.* ("It has been settled law in this circuit for many years that a plaintiff cannot invoke the 'relation back' principles of Fed. R. Civ. P. 15(c) to replace 'John Doe' defendants with named defendants after the statute of limitations period has expired.") (collecting cases). As a result, this opinion only addresses the claims against the Village and Officer Pearson. Even if Trejo had been given leave to amend a second time, however, so as to proceed against the specific officers designated as "John Doe" defendants, for reasons explained further herein, all charges against the named "John Doe" defendants would be dismissed except for the § 1983 excessive force claim (Count I).

[2] The relevant facts are taken from the Defendants' Local Rule 56.1 ("L.R. 56.1") statement of facts and exhibits and from Plaintiff's response to Defendants' statement of facts. Where the parties disagree over relevant facts, the Court sets forth the competing versions. The Court, as it must, resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The Court also has held the parties to the requirements of Local Rule 56.1, as is typically the case in this district. In this regard, the Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance" with Local Rule 56.1. *Bordelon v. Chicago Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000); *see also Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) (failure to adhere to Local Rule 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission).

history of this case in this Court.

1. Events Relating to Plaintiff's Arrest on March 7, 2000

Events began in the Fall of 1999, when Plaintiff, a fifty-five year old man who states that he lives with his mother, first met and first spoke with Jessica Galvez, a young woman who worked at the Itasca Bank as a teller during the relevant time period. (*Id.* ¶ 9-10.) On February 14, 2000, Ms. Galvez reported to an Itasca police officer that Trejo had spoken to her at her teller window, during which time Trejo asked if she had a boyfriend, asked for Ms. Galvez's phone number, and told Ms. Galvez that he had heard that she was a victim of kidnap and rape. (*Id.* ¶ 12.)[3] One week later, Ms. Galvez reported to Officer Pearson that Plaintiff had come into the bank saying that she was in danger of being kidnapped and that she should give him her telephone number. (*Id.* ¶ 15.)[4] Soon after this incident, Officer Pearson went to Plaintiff's home and explained to Plaintiff that he should not have any further contact with Ms. Galvez. (*Id.* ¶ 17.) In late February 2000, Trejo wrote numerous letters to several businesses, the Itasca Bank, the DuPage County State's Attorney, and the Itasca Police Department requesting videotapes of and documents concerning rapes occurring on business premises (including, in particular, any rapes of "Jessica G. ((teller at Itasca Bank and Trust Co.))"), and threatening legal action against the

---

[3] Trejo denies that he made such statements (D.E. 63 (Pl. SF ¶ 11)) but does not dispute that Ms. Galvez so reported the conversation to the Itasca Police Department on February 14, 2000. (Id. ¶ 12.)

[4] Pursuant to LR 56.1, this fact was deemed admitted in Plaintiff's Response to Def. SF, because Plaintiff's response in Paragraph 15 was unresponsive to the factual assertion as framed above. (D.E. 64 ¶ 15.) To be entirely fair to Trejo, however, the Court notes that Trejo denied that he in fact made the statements that Ms. Galvez undisputably reported to the police.

Itasca Bank. (*Id.* ¶ 18.)[5]

On March 7, 2000, Ms. Galvez again complained to Officer Pearson of Plaintiff's conduct towards her, and she signed a complaint for disorderly conduct against him. (*Id.* ¶ 19.) In that sworn complaint, Ms. Galvez states that Trejo told Ms. Galvez that he had heard she was a victim of a kidnapping and rape, asked if she had a boyfriend, sent numerous letters to the Itasca Bank and Itasca Police Department stating that he was Ms. Galvez's fiancé, stated that he had the right to protect her by using deadly force, and explained that Trejo had been asked to leave the Itasca Bank for causing a disturbance. (*Id.* ¶ 20. & Def. Ex. J.) Later that day, Ms. Galvez accompanied Officer Pearson to the DuPage County Courthouse, where Judge Minton issued a warrant for Plaintiff's arrest and a "no-contact" order. (*Id.* ¶ 21.)

Based on Judge Minton's issuance of the warrant, Officer Pearson, Sergeant Moersch,

---

[5] Trejo admits the allegations set forth in Def. SF ¶ 18, but contends that the information is "not material" and "inadmissible." Trejo offers no explanation why the statements and documents are supposedly "inadmissible," and the Court considers this argument waived. The argument also appears to be clearly incorrect, as Defendants cite Trejo's own deposition testimony (*i.e.*, the testimony of a party-opponent) in which Trejo admits to writing the letters requesting videotapes of rape scenes to various stores in his area and asserts that store employees suggested that he could obtain such tapes. (*See, e.g.*, D.E. 55, Def. Ex. F at 115-18 (Trejo's deposition testimony in which he explains that he wrote to the local Jewel-Osco because "[t]hey told me they had rape videos regarding, you know, certain ladies that I knew" (*id.* at 116) "the rapes had been caught on video inside the store." (*Id.* at 117)) In Trejo's letter to the Jewel-Osco (and this is only one of several such letters to local businesses), Trejo asks for any videotapes involving "Jessica G. ((teller at Itasca Bank and Trust Co.)). . . . Kindly copy and place any rapes, incidents of a sexual nature, or sexually related nature, . . . so as to keep such material separated and segregated from other requested material." (D.E. 55, Def. Ex. I, at 1 (Trejo letter of February 21, 2000 to Jewel-Osco)). The Court also rejects Trejo's materiality argument. The statements in Defendants' Statement of Facts and supporting documentary evidence concerning Trejo's letters certainly are not outcome determinative for the Court (in the sense that the Court's decision does not turn on them in any way), but they do provide useful context concerning the bizarre and frightening behavior that Plaintiff admits he was undertaking during the time period that Ms. Galvez swore out a criminal complaint against him.

and Officer Kauther of the Itasca Police Department drove separately to Plaintiff's residence to arrest him. (*Id.* ¶ 22.) As explained further below, the parties disagree about the particulars of the arrest, with Defendants contending that Trejo unlawfully resisted arrest and Trejo contending that he was the victim of excessive force that left him with a bruises on his arm and a strained finger. It is undisputed, however, that ultimately the police placed Plaintiff in handcuffs, placed him in the back of a police car, and took him to the Itasca Police Station. (*Id.* ¶¶ 27-38.) At the station, Trejo was fingerprinted, photographed, and released on bond. (*Id.* ¶ 38.) When Trejo returned home, he took no medication to relieve any pain from the bruises on his arm or his strained finger, and he thought the conditions would go away. (*Id.* ¶ 39.) The next day, March 8, 2000, Plaintiff sought medical attention for a bruised arm and injured finger at the emergency room of Alexian Brothers Hospital. (*Id.* ¶ 40.)

After the arrest on March 7, Officer Pearson filed a criminal complaint against Plaintiff charging that he resisted arrest. (*Id.* ¶ 52.) This charge was added to the prior disorderly conduct charge that was the subject of the arrest warrant.

Criminal proceedings were pursued by the DuPage County State's Attorney against Trejo in the Illinois state courts. On April 4, 2000, Plaintiff improperly attempted to remove his state-court criminal prosecution to federal court by filing a Notice of Removal, which was assigned Case No. 00-C-2199. (*Id.* ¶ 57-58.) That "notice of removal"—which was some 140 pages in length with all of the related attachments—included within it a "counter-claim" in which Plaintiff purported to assert various causes of action against Ms. Galvez and Officer Pearson relating to the April 2000 arrest and subsequent criminal prosecution, including a claim under Section 1983. (D.E. 1 in Case No. 00-C-2199.). Judge Matthew Kennelly of this Court, who was assigned Case

No. 00-C-2199, remanded the case on May 3, 2000, to the Eighteenth Judicial Circuit Court in DuPage County, Illinois, for lack of federal jurisdiction. (Def. SF ¶ 58.) At the time of the remand in May 2000, Judge Kennelly informed Trejo that the criminal prosecution against him could not be removed under 28 U.S.C. §§ 1441-43. (D.E. 55, Exhibit V at 2.) At that same time—*i.e.*, in May 2000, or well before the statute of limitations for state law claims had run under Illinois law—Judge Kennelly advised Trejo that, with respect to the civil "counterclaims" to the criminal prosecution that Plaintiff purported to remove to federal court, Plaintiff might "be able to maintain a civil lawsuit against the police officers or others claimed to have violated his rights, but he may do this only by filing a civil action, not by trying to remove the pending state criminal cases to federal court." (*Id.*) Following remand, in the Illinois courts, Ms. Galvez's complaint of disorderly conduct was nolle prossed. Plaintiff was tried on a charge of resisting a peace officer and found guilty by a jury of his peers on May 16, 2001. (Def. SF ¶ 53.)

Not surprisingly, the bulk of the differing accounts of the facts surround what transpired after the officers arrived at Plaintiff's house and before Plaintiff arrived at the police station. Defendants contend that Officer Pearson and Sergeant Moersch made their presence known by ringing Plaintiff's doorbell and telling Plaintiff that they had a warrant for his arrest. (*Id.* ¶¶ 24-25.) Officer Pearson then showed the warrant to Plaintiff. (*Id.* ¶ 25.) When Plaintiff answered the door, he began shouting profanities at the officers and attempted to close the screen door. (*Id.* ¶¶ 26-28.) When Plaintiff began closing the screen door, Officer Pearson and Sergeant Moersch held the door open and stepped inside to arrest him. (*Id.* ¶ 28.) Defendants allege that Plaintiff vigorously resisted arrest by pushing and shoving the officers, swearing at the officers, grabbing hold of the handcuffs as Officer Pearson attempted to place them on him, and pushing

Officer Pearson against a wall. (*Id.* ¶¶ 29-30.) After the struggle, Sergeant Moersch was able to handcuff Plaintiff's left wrist, but the cuff kept flailing because Plaintiff tried to keep his arm away from Sergeant Moersch. (*Id.* ¶ 32.) Finally, the officers were able to pull Plaintiff out the front door. (*Id.* ¶ 35.) Once outside the front door, Sergeant Moersch and Officer Pearson were finally able to secure handcuffs on both of Plaintiff's wrists. (*Id.* ¶ 37.)

Plaintiff, on the other hand, claims that Officer Pearson and Sergeant Moersch did ring the doorbell to alert him of their presence, but at no time did they state that they had a warrant for his arrest, nor did they show him a warrant. (D.E. 63 ¶¶ 24-25.) Nonetheless, Plaintiff immediately opened the door in response to the officers. (D.E. 54 ¶ 41.) He became agitated at not being served a document at his front door and told Officer Pearson to "[j]ust get the fuck out." (*Id.* ¶¶ 42-43.) According to Trejo, Officer Pearson then yelled "[g]et him," and the police officers forced open the door, catching Plaintiff's finger in the latch. (*Id.* ¶¶ 44-45.) Once the officers entered the house, Officer Pearson and Sergeant Moersch slammed Plaintiff up against a wall in the foyer, and Officer Kauther charged into his sternum. (*Id.* ¶¶ 46-47.) Then, as Plaintiff was holding out his arm, Sergeant Moersch placed a handcuff on it and started "ratcheting his arm, up and down on his wrist and whole arm, with an open handcuff." (*Id.* ¶ 48.) Although Officer Pearson told Sergeant Moersch to stop, the sergeant continued. (*Id.* ¶ 49.) Plaintiff alleges that he cooperated fully with the police and did not struggle, swear, or resist arrest whatsoever. (D.E. 63 ¶ 29-34.) Plaintiff then walked out onto the porch by himself, and then someone (presumably an officer) forced his head down on his chest and fastened the handcuffs. (*Id.* ¶ 50.) Plaintiff was then transported to the station. (*Id.* ¶ 51.)

2.      Procedural history in this court

On February 20, 2002, Plaintiff filed a *pro se* complaint in this Court, alleging various causes of action against the Village of Itasca relating to his 2000 arrest and criminal prosecution. (D.E. 1.) The filing was denominated as a "Complaint," and the case was assigned case number 02-C-1193 and assigned to the calendar of Judge Marovich. (*Id.*)

On January 27, 2003, Plaintiff, then represented by an attorney, filed an Amended Complaint, which added as Defendants Officer Pearson and other "Unknown Officers" of the Itasca Police Department. (D.E. 22.) The Amended Complaint alleged a variety of state and federal causes of action. (*Id.*) Count One advances an excessive force claim against the officers and a related failure to train claim against Itasca under Section 1983; Count Two is a state law "assault and battery" claim against "Defendant Officers"; Count Three is a state law malicious prosecution claim against "Defendant Officers"; Count Four is a Section 1983 claim for false arrest and unlawful seizure against "Defendant Officers"; and Counts Five and Six are state law claims against Itasca alleging liability under the theories of *respondeat superior* and indemnification. (*Id.*) On April 15, 2004, this Court denied Defendants' second motion to dismiss because it was procedurally defective and contained issues that were more properly resolved at the summary judgement stage. (D.E. 47.)

On May 26, 2004, Defendants moved for summary judgment on all counts of the Amended Complaint. (D.E. 52.)[6] First, they argue that Plaintiff's state law claims are barred as

---

[6] As indicated, on June 1, 2004, shortly after the filing of the summary judgment motion, this Court (D.E. 60) granted Defendants' motion to strike the proposed second amended complaint, by which Trejo would have sought (in an untimely manner) to specifically name two Itasca Police Officers, Barry Kauther and Mark Moersche, in lieu of the "John Doe"/"Unknown Officer" defendants. As a result, this opinion does not specifically address any claims against Kauther and Moersche.

a matter of law by the one-year statute of limitations under the Illinois Tort Immunity Act, 745 Ill. Comp. Stat. 10/8-101, because Plaintiff's 2002 federal suit (Case No. 02-C-1193, assigned initially to Judge Marovich) does not relate back to the Plaintiff's defective April 4, 2000, notice of removal (Case No. 00-C-2199, assigned to Judge Kennelly), as Plaintiff contends. (D.E. 53 at 5.) As to the assault and battery claim, Defendant Pearson also maintains that he enjoys qualified immunity from the lawsuit. (*Id.* at 22.) Defendant Pearson argues that the malicious prosecution claim must fail because probable cause existed for Plaintiff's arrest and because the prosecution against Plaintiff did not terminate in his favor. (*Id.* at 20-21.) Defendants assert that the Section 1983 claim alleging excessive force and failure to train must fail given the standards set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994), and because no proof exists that any misconduct was part of an official policy or custom, respectively. (*Id.* at 12-14.) Finally, Defendant Pearson argues that Plaintiff's unlawful arrest allegation against him must fail because the Itasca police had probable cause under a valid arrest warrant, or, alternatively, that qualified immunity protects Officer Pearson from the claim in any event. (*Id.* at 9-11.)

In response, Plaintiff first argues that the 2002 Complaint in Case No. 02-C-1193 "related back" under Federal Rule of Civil Procedure 15 to Trejo's April 2000 Notice of Removal (Case No. 00-C-2199), in which, as a criminal defendant, Trejo attempted to remove his state law charge of resisting arrest to the Northern District of Illinois. (D.E. 64 at 2.) Trejo responds to Defendants' other arguments by arguing that factual disputes exist such that it would be improper for this Court to grant summary judgment at this time (D.E. 64 at 12, 16, 20) and that the wanton and willful nature of Defendants' conduct precludes a finding of qualified immunity. (*Id.* at 8.)

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact.  *See Murphy v. ITT Educ. Servs., Inc.*, 176 F.3d 934, 936 (7th Cir. 1999) (citation omitted).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Mere "metaphysical doubt as to the material facts" does not amount to a genuine issue for trial.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant.  *See* Fed R. Civ. P. 56(c); *Foley* 359 F.3d at 928.  The party opposing summary judgment may not rest upon the pleadings, but must set forth specific facts showing that there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 248.  There is no genuine issue for trial unless there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id*.

## III.  DISCUSSION

    A.    State Law Claims and the Statute of Limitation

        1.    The 2002 Lawsuit Does Not "Relate Back" to Plaintiff's 2000 "Notice of Removal" of His State Court Criminal Prosecution.

It is now appropriate for this Court to rule on Defendants' argument that the state law claims are barred by the one-year statute of limitations that clearly ran unless Plaintiff's 2002 complaint (Case No. 02-C-1193) "relates back" to his defective "notice of removal" of his state court criminal prosecution in 2000 (Case No. 00-C-2199). Rule 15(c) permits a plaintiff to amend the pleadings to add a claim involving an existing party or a new party that, if filed as a new lawsuit, would be barred by the statute of limitations. *See Jones v. Wysinger*, 815 F. Supp. 1127, 1129 (N.D. Ill. 1993).

As this Court has previously explained, Judge Marovich in an opinion of December 9, 2003, rejected Defendants' contention that Trejo's state law claims were barred by the one-year limitations period under Illinois law. (D.E. 37 at 5-7.) In that opinion, the Court stated that "the Plaintiff asserts that under 15(c) of the Code of Civil Procedure, relation back to the original pleading filed by Trejo, pro se, on April 7, 2000, is proper. This Court agrees." (*Id.* at 5-6.) In the December 9, 2003, opinion, the Court stated that "Trejo's pleading, filed on April 7, 2000, contains essentially the same claims against the parties identified in his Amended Complaint filed January 24, 2003. Moreover, the facts and events detailed in Trejo's pleading of April 7, 2000, arose out of the same occurrence as the Amended Complaint." (*Id.* at 6.)

Following this decision, the Defendants filed a second motion to dismiss before Judge Marovich, which was in essence akin to a motion for reconsideration. (D.E. 45 at 2 (Defendants stating that the second motion was warranted "to draw the Court's attention to the highly unusual circumstances of plaintiff's relation-back argument to save his state-law claims.").) During the briefing on that motion, Defendants cited three circuit court precedents, in which, they contended, similar relation-back theories were rejected by federal courts of appeal, including the

Seventh Circuit. (*Id.* at 2-3.) (While the issue was squarely presented in prior briefing, the issue was not the subject of extensive citation of caselaw by either side, so Judge Marovich was not apprised of this court of appeals authority.) This Court, following reassignment of the case to its docket, denied this second motion without prejudice on procedural grounds, in part because Defendants also made fact-sensitive arguments on certain issues that needed to be addressed in a summary judgment setting. At that time, this Court noted that Defendants had "presented substantial authority casting doubt on the legal propriety of . . . [the] December 2003 ruling under Rule 15(c)" concerning the relation-back issue. (D.E. 47 at 7.) For reasons explained further below, the Court at this time finds that precedent instructs that Trejo's state law claims are indeed time-barred.

Plaintiff has *never* cited a supporting case concerning a remotely analogous circumstance—*i.e.*, one in which a plaintiff was allowed to circumvent a statute of limitations by "relating back" an otherwise-untimely suit to a dismissed and patently defective "notice of removal" of a state criminal prosecution that also improperly purported to add civil "counterclaims" by the criminal defendant. (The law, of course, does not allow a criminal defendant to conflate proceedings by adding civil claims of his own; nor does the law provide that a criminal defendant like Trejo may remove his state law criminal prosecution to federal court.) Nor has plaintiff ever cited any case where a plaintiff was able to "relate back" an entirely new complaint with a new case number to a dismissed filing that was assigned a separate case number and was assigned to a separate judge. The opinion of December 2003 also cited no supporting authority in the course of its analysis.

In contrast, numerous cases teach that Trejo's "relation back" argument is flawed. Taken

12

together, they teach that Trejo should not fairly be allowed to escape the statute of limitations

under Illinois law by "relating back" his otherwise untimely claims raised in his Amended

Complaint of January 24, 2003 in Case No. 02-C-1193 to his defective "notice of removal" of his

state court criminal prosecution filed and quickly dismissed in Case. No. 00-C-2199 before

another judge in this district. This conclusion is supported by the fact that Judge Kennelly

expressly told Trejo at the time his "notice of removal" was rejected (and long before the Illinois

statute of limitations ran) that Trejo needed to file a civil complaint if he wanted to assert such

claims.

As indicated, many cases reflect that Trejo's relation back argument is non-meritorious.

For example, in *Bailey v. Northern Ind. Pub. Serv. Co.*, 910 F.2d 406 (7th Cir. 1990), the

Seventh Circuit rejected a relation-back theory and stated that "rule 15(c), by its terms, only

applies to amended pleadings in the same action as the original, timely pleading." *Id.* at 413. In

*Bailey*, the plaintiff's Section 1981 claim needed to be brought, under the applicable statute of

limitations, by October 12, 1986. *Id.* at 412. The plaintiff filed suit in November 1986, but he

argued that the complaint in the November 1986 action "related back" under Fed. R. Civ. P.

15(c) to the complaint in an earlier lawsuit plaintiff filed against the defendant-employer that also

alleged acts of employment discrimination. *Id.* at 412-13. Notwithstanding that the two suits

even were partially consolidated for trial (*id.* at 407), the Seventh Circuit rejected the "relation

back" argument, again stating that Rule 15(c), "by its terms, only applies to amended pleadings

in the same action as the original, timely pleading. Because the simulator claim was not

contained in amended pleading in Suit 1 but in a second, separate complaint, Rule 15(c) is

inapplicable." *Id.* at 413 (footnote omitted). *Accord, e.g., Benge v. United States*, 17 F.3d 1286,

1288 (10th Cir. 1994) ("[A] separately filed claim, as opposed to an amendment or a supplementary pleading, does not relate back to a previously filed claim."); *Bui v. IBP, Inc.*, 205 F. Supp. 2d 1181, 1184085 (D. Kan. 2002) ("Plaintiff cites no cases, and the court has found none, supporting his unusual assertion that Rule 15 should be applied to permit a pleading in one case to 'relate back' to a pleading in a separate case . . . . The rule permits amended pleadings to relate back to original pleadings in the same case, not in a separate one."); *Bamberg v. SG Cowen*, 236 F. Supp. 2d 79, 87 (D.Mass. 2002); *In re Bausch & Lomb, Inc. Sec. Litig.* 941 F.Supp.1352, 1363-65 (W.D.N.Y. 1996) (holding that plaintiff's new claim in pending case could not relate back to the date of original filing of separate case with which plaintiff's later case was consolidated); *Morin v. Trupin*, 778 F.Supp. 711, 733-34 (S.D.N.Y. 1991) (same).[7]

Nor is *pro se* status enough to excuse a litigant from compliance with these basic principles. For example, in *Worthams v. Atlanta Life Ins. Co.*, 533 F.2d 994 (6th Cir. 1976), a

---

[7] Under Seventh Circuit precedent, it does not appear that a subsequent lawsuit properly initiated via the filing of a complaint ever could relate to a "notice of removal" of a criminal case, even if there were purported "civil counterclaims" added to the criminal case. Specifically, Fed. R. Civ. P. 15 by its terms addresses when "[a]n amendment of a *pleading*" may "relat[e] back to the date of the *original pleading." Id.* (emphases added). However, Fed. R. Civ. P. 7 expressly defines what legal documents do and do not qualify as a "pleading," and that definition does not include a "notice of removal." *See* Fed. R. Civ. P. 7(a) (listing the "pleadings" and stating that "[n]o other pleading shall be allowed . . . ."). The Seventh Circuit has noted and relied upon the distinction in Rule 7 between "pleadings" and other filings. *See Duda v. Bd. of Educ. of Franklin Park* 133 F.3d 1054, 1056 n.2 (7th Cir. 1998) ("'The term *responsive pleading* is defined by reference to Rule 7(a) . . . [which] provides an exclusive list of what is a pleading: a complaint, an answer, a reply to a counterclaim, an answer to a counterclaim, a third-party complaint, and an answer.'") (quoting 3 James Wm. Moore et al., Moore's Federal Practice ¶ 15.11 (3d ed. 1997) (emphasis in *Duda*); *see also id.* (collecting cases which distinguish whether a plaintiff can amend a complaint as of right under Fed. R. Civ. P. 15 based on whether a responsive pleading, such as an answer, or a non-pleading, such as motion to dismiss, has been filed). Accordingly, by its terms Rule 15 would not appear to allow Trejo's pleading to "relate back" to his non-pleading/notice of removal.

14

pro se litigant filed a timely complaint that was dismissed without prejudice for failure to state a

claim. *Id.* at 996. Approximately one year later, the *pro se* plaintiff, now aided by counsel, filed

what they denominated an "amended complaint" and explicitly set forth the various causes of

action, including an action for libel that raised issues not presented by the prior filing. *Id.* The

Sixth Circuit rejected the notion that they new complaint "related back" to the first action that

was dismissed, reasoning that

> The original complaint was disposed of by order of dismissal, without prejudice, for
> failure to alleged sufficient facts to constitute a cause of action against the insurance
> company. The second complaint was entitled "amended complaint" and Worthams
> undertook to use the same civil action number as the first suit. The record shows that the
> word "amended" has been stricken and a new civil action number assigned. The January
> 5, 1973, complaint must be viewed as a new cause of action and not as an amended
> complaint.

*Id.*

Similarly, in *Marsh v. Soares*, 223 F.3d 1217 (10th Cir. 2000), the Tenth Circuit joined

the Second, Third, Fifth, Ninth, and Eleventh Circuits and held that a subsequently filed *pro se*

habeas petition cannot relate back under Fed. R. Civ. P. 15(c) to an otherwise timely *pro se*

habeas petition previously dismissed without prejudice for failure to comply with the strictures

attending habeas corpus litigation. *Id.* at 1220. The Tenth Circuit stated

> Fed. R. Civ. P. 15(c) permits the relation back of an "amendment of a pleading."
> However, Mr. Marsh's second habeas petition was more than an amendment; it was a
> separate filing, some three years after the first petition. "[A] separate filed claim, as
> opposed to an amendment or a supplementary pleading, does not relate back to a
> previously filed claim."

*Marsh*, 223 F.3d at 1219 (quoting *Benge*, 17 F.3d at 1288). Thus, in addition to the Sixth

Circuit's *Worthams* decision cited above, other federal courts have rejected the idea that *pro se*

status is a sufficiently compelling consideration to disregard otherwise applicable rules

concerning "relation back"—even in the setting of habeas corpus litigation, where the issues at stake reach to the petitioner's life and liberty.[8]

The facts of this case confirm the equities in rejecting Trejo's attempt to "relate back" his untimely claims to his notice of removal. At the time Trejo's "removal" of his state court criminal prosecution was remanded to state court in Case No. 00-C-2199, Judge Kennelly specifically told Trejo that if he wanted to file civil claims, he could not do so by attempting to interject them into a state court criminal prosecution, but instead needed to file a civil complaint. Judge Kennelly told this to Trejo long before the Illinois statute of limitations ran. The fact that Trejo thereafter was dilatory in proceeding is not a basis for thinking that he was treated unfairly under the law.

Finally, the Court respectfully rejects Trejo's suggestion that Defendants have no statute of limitations defense because they had proper notice of putative claims against them through Trejo's ill-conceived "notice of removal" of the state court criminal case. "Notice" alone is not enough to toll a statute of limitation, otherwise a letter or phone call would be enough. Trejo's "notice of removal" was a sprawling, 140-page document (including exhibits) whose caption referenced the Circuit Court of DuPage County, Illinois, and named as putative parties the "People of the State of Illinois," the Itasca Bank & Trust Co., and Jessica Galvez, along with Jack Pearson, the Village of Itasca Police Department, and an open-ended "et al" designation. It

---

[8] Arguably, this case provides an even more egregious example of separate claims than *Bailey* or *Marsh*, since the claim involving the Notice of Removal was a criminal case, and the current case Defendant seeks to relate back to the Notice of Removal is of the civil variety. Moreover, the "notice of removal" concerning the criminal case was from an entirely distinct case (00-C-2199) than this one (02-C-1193).

references a hodge-podge of semi-coherent legal theories and includes photocopies of, *inter alia*, state court records, federal criminal code provisions, and letters Trejo had written. The "notice of removal" cannot fairly be taken to have provided either of the Defendants (nor Ms. Galvez, nor the Itasca Bank & Trust Co., nor the "People of the State of Illinois," all of whom presumably under Trejo's theory still could be subject to suit in future cases that might "relate back" to the "notice of removal" in Case No. 00-C-2199) that they were the subject of a valid (or at least coherent) civil suit. Accordingly, the Court rejects any suggestion that Trejo complied with the requirement under the Federal Rules of Civil Procedure that the pleadings give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

For all of these reasons, the Court holds that the Plaintiff's initial *pro se* Complaint in Case No. 02-C-1193, filed on February 20, 2002, does not relate back to the April 7, 2000, Notice of Removal in Case No. 00-C-2199.

### 2. Equitable Tolling is Not Appropriate.

Plaintiff also argues in the alternative that if the complaint does not relate back to the Notice of Removal, the statute of limitations should be equitably tolled. (D.E. 64 at 6.) Plaintiff maintains that, as a *pro se* plaintiff, he should be allowed enough leeway to bring the state law claims, since in his view the "notice of removal" of the state law criminal charges and putative civil "counterclaims" essentially raised all claims and named all parties reasonably diligently. (*Id.* at 7.) Failing to equitably toll the statute of limitations, Plaintiff maintains, would "elevate[] form over substance." (*Id.* at 8.) This argument is also unconvincing.

The doctrine of equitable tolling "permits a plaintiff to sue after the statute of limitations has expired if through no fault or lack of diligence on his part he was unable to sue before, even

though the defendant took no active steps to prevent him from suing." *Donald v. Cook County Sheriff's Dept.* 95 F.3d 548, 561-62 (7th Cir. 1996) (quoting *Singletary v. Cont'l Ill. Nat'l Bank and Trust Co. of Chicago*, 9 F.3d 1236, 1241 (7th Cir.1993)). Equitable tolling applies where "despite the exercise of reasonable diligence, [the plaintiff could not] have discovered all the information he needed in order to be able to file his claim on time." *Taliani v. Chrans*, 189 F.3d 597, 598 (7th Cir. 1999). Precedent teaches that equitable tolling "is granted sparingly." *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) (citing *Irwin v. Dept. of Veterans Affairs*, 498 U.S. 89, 96 (1990)). "Extraordinary circumstances far beyond the litigant's control must have prevented timely filing." *Marcello*, 212 F.3d at 1010 (collecting cases).

To be sure, district courts have a responsibility to construe *pro se* complaints generously. *See, e.g., Donald*, 95 F.3d at 555. However, a plaintiff's *pro se* status does not, of its own accord, provide an independent basis for equitable tolling. *See, e.g., Cosby v. United Air Lines, Inc.*, No. 95-C-6655, 1996 WL 204323, at *3 (N.D. Ill. Apr. 24, 1996) (citing *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984)). Even *pro se* plaintiffs have to abide by procedural rules; leeway is not synonymous with absolution from procedural requirements or statutes of limitation that embody societal balancing assessments about when claims must be brought, when evidence is likely to become stale and unreliable, and when putative defendants (including putative *pro se* defendants) should be absolved from the threat of litigation. *See, e.g., Jackson v. Carpenters Local Union #1*, No. 02 C 9091, 2004 WL 2191584, at *3 (N.D. Ill. Sep. 24, 2004) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)).

The Court finds that Plaintiff did not exercise reasonable diligence in filing an actual complaint and providing notice to Defendants. First, as discussed above, Plaintiff's ill-conceived

18

"notice of removal" that attempted to remove his state court prosecution to federal court and add into the criminal prosecution his own civil counterclaims did not amount to a federal complaint in this court, and the "notice of removal" failed to appraise adequately parties of claims against them. Furthermore, the alleged activity that gave rise to Plaintiff's complaint took place on March 7, 2000. (D.E. 54, ¶ 22.) Plaintiff filed the "notice of removal" that was dismissed with the criminal prosecution remanded to state court on May 3, 2000. (*Id.* ¶¶ 57-58). However, Plaintiff waited almost two full years, until February 21, 2002, to file his original complaint with the Court (or almost a full year after the statute of limitations had run for state law claims). (D.E. 1.) Such a delay is unreasonable in light of the fact that Trejo was free to conduct his own investigation and pursue the case as vigorously as he chose. *See, e.g., Taliani*, 189 F.3d at 598 (requiring a litigant seeking to invoke equitable tolling to have exercised reasonable diligence and to have done so in a setting where plaintiff could not have discovered all the information he needed to be able to timely file the claim).

Moreover, and most important on the facts of this case, Judge Kennelly *expressly told* Trejo that his "notice of removal" was insufficient to be considered a complaint. In this regard, Judge Kennelly told Plaintiff in writing that he would be able to maintain a civil lawsuit "only by filing a civil action, not by trying to remove the pending state criminal cases to federal court." (D.E. 55, Exhibit V at 2.) Trejo did not timely heed this directive, and instead waited until the state law statute of limitations had run. Equitable tolling applies when a person does not and cannot learn the facts on which he or she bases a claim. Plaintiff, however, knew all of the facts relevant to his claim in 2000. He does not even allege that he learned anything subsequent to the date of the incident. *See, e.g., Bishop v. Washington*, No. 98-C-8023, 2000 U.S. Dist. LEXIS

18874, at *4-5 (N.D. Ill. Dec. 18, 2000) (holding, in circumstances similar to the instant case, that "ignorance of the limitations period is no excuse"). Therefore, because the record does not show that Trejo exercised reasonable diligence in filing his Complaint, the Court will not equitably toll the statute of limitations and, thus, he may not avoid the statutory bar.

As a result, the Court finds that Plaintiff's state law claims, specifically Counts II, III, V, and VI have been brought beyond the statute of limitations. Defendants are granted summary judgment on those claims.[9]

---

[9] Because the Court grants summary judgment on the statute of limitation issue, the Court need not definitively address the other grounds upon which Defendants have moved for summary judgment on the state law claims. It is worth noting, however, that at least one of Defendants' arguments would likely provide another adequate and independent basis for summary judgment—*i.e.*, on Trejo's state law malicious prosecution claim. To prevail on a malicious prosecution claim under Illinois law, a plaintiff must establish, *inter alia*, "that the criminal proceeding at issue was terminated in his favor." *Logan v. Caterpillar, Inc.* 246 F.3d 912, 924 (7th Cir. 2001). When a state law criminal proceeding terminates via a *nolle prosequi* dismissal (as was the case with the disorderly conduct charge for which Ms. Galvez was the complainant), "the plaintiff bears the burden of showing that the *nolle prosequi* was entered for reasons consistent with his innocence" as opposed to "'reasons not indicative of the innocence of the accused.'" *Id.* at 925 (citing and quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242-43 (Ill. 1996)). A plaintiff's burden "will only be met if the plaintiff establishes that the circumstances surrounding the criminal proceedings compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution." *Id.* (internal quotation, elipses, and citation omitted). In this case, Plaintiff almost certainly would not be able to discharge his burden of showing that the circumstances surrounding the *nolle prosequi* compelled the inference that there were not reasonable grounds to pursue the prosecution. Once the resisting a peace officer charge was added to the case against Trejo, many prosecutors would jettison the disorderly conduct charge so as to spare the complainant the burden of testifying against a criminal defendant who would, no matter how the criminal prosecution turned out, soon be back in the community where the complainant resided. (Trejo, for example, received a sentence of ten days with the Sheriff's Work Alternative Program and was subject to a one-year conditional discharge as a result of the resisting a peace officer charge; there is no realistic scenario in which he would have received a materially longer sentence if he had been convicted on a Class C misdemeanor disorderly conduct charge (*see* 720 ILCS 5/26-(a)(1) & (b)) in addition to the Class A misdemeanor charge of resisting a peace officer (*see* 720 ILCS 5/31-1).) As a result, the malicious prosecution claim almost certainly would fail because Plaintiff has not adduced sufficient evidence to create a triable issue regarding whether the circumstances surrounding the *nolle prosequi* compelled an

B.    Count I: §1983 Claim for Use of Excessive Force

Defendants argue that Plaintiff's Section 1983 claim of excessive use of force is barred by

*Heck v. Humphrey*, 512 U.S. 477 (1994), because findings on those claims would "necessarily

imply that [Plaintiff's] criminal conviction was wrongful." (D.E. 53 at 12.)  In *Heck*, the

Supreme Court held that:

> In order to recover damages for . . . harm caused by actions whose unlawfulness
> would render a conviction or sentence invalid, a §1983 plaintiff must prove that the
> conviction or sentence has been reversed on direct appeal, expunged by executive order,
> declared invalid by a state tribunal authorized to make such determination, or called into
> question by a federal court's issuance of a writ of habeas corpus.

*Heck*, 512 U.S. at 486-87.  This, according to Defendants, is the consequence of Plaintiff's

conviction for resisting a peace officer. (D.E. 55 at 12.)  There is an exception to the *Heck* rule,

however, "[i]f the district court determines that the plaintiff's [Section 1983] action, even if

successful, will not demonstrate the invalidity of any outstanding criminal judgment against the

plaintiff."  *Id.* at 487.  The Illinois statute criminalizing resist of a peace officer, the crime of

which Plaintiff was convicted, states that:

> A person is not authorized to use force to resist an arrest which he knows is being made
> either by a police officer or by a private person summoned and directed by a police officer
> to make an arrest, even if he believes that the arrest is unlawful and the arrest in fact is
> unlawful.

720 Ill. Comp. Stat. 5/31-1 (2004).[10]

---

inference on the facts of this case that there were no reasonable grounds to have presented a
disorderly conduct case against Trejo.  This conclusion is reinforced by the fact that there is
documentary evidence consistent with Ms. Galvez's account of the facts (*i.e.*, that Trejo was
asking whether she had been raped and kidnapped, and impliedly threatening her in the process)
and inconsistent with Trejo's apparent account (*i.e.*, that Ms. Galvez had agreed to marry him).

[10] In a prior opinion on Defendants' motion to dismiss, Judge Marovich indicated that
Trejo was convicted of resisting arrest, which is codified at 720 Ill. Comp. Stat. 5/7-7.  This

In the caselaw of the Northern District of Illinois courts, there appears to be a split (or at least substantial tension) concerning whether *Heck* bars a claim of excessive force in light of a conviction for resisting arrest or resisting a peace officer. For example, *Holder v. Ivanjack*, 93 F. Supp. 2d 933 (N.D. Ill. 2000) (Alesia, J.), held that *Heck* barred cases such as the instant one. In *Holder*, an arrestee brought a Section 1983 action against police officers alleging excessive use of force, among other claims. *Holder*, 93 F. Supp. 2d at 935. In 1997, police officers responding to a shooting incident in Holder's neighborhood saw Holder in a nearby backyard, and they ordered him to leave the yard, but he did not. *See id.* The police then arrested Holder for resisting or obstructing a police officer. *See id.* In his state court criminal trial, Holder alleged self-defense: he claimed that because five to ten police officers punched, kicked, and beat him with flashlights and batons during the arrest, Holder was entitled to a self-defense jury instruction. *See id.* at 935-36. The trial judge refused such an instruction. *See id.* Holder appealed his conviction, but the appellate court affirmed, stating that the judge's refusal to give a self-defense jury instruction was proper. *See id.* at 936. On Holder's later civil complaint alleging the police used excessive force, the district court ruled that *Heck* barred Holder's claim:

> In this case, for Holder to succeed on his § 1983 claim, the trier of fact would have to find that the police officers used excessive force to effectuate Holder's arrest. However, in their affirmation of Holder's conviction for resisting or obstructing a peace officer, the Illinois Appellate Court stated that if the jury had found that the police officers involved used unreasonable or excessive force, then the jury from Holder's criminal trial would

---

contention appears to be incorrect. (*See Trejo v. Village of Itasca*, No. 02-C-1193 (N.D. Ill. Dec. 9, 2003) (Marovich, J.) (D.E. 37). The resisting arrest statute differs from the "Resisting a Peace Officer" statute, which is codified at 720 Ill. Comp. Stat. 5/31-1. Trejo was prosecuted, convicted, and sentenced under the latter charge. (D.E. 55, Exhibit Q at 1.) However, this distinction appears to be immaterial; the Court has been unable to detect any different treatment in the caselaw between the two charges, and Illinois courts seem to treat the two offenses interchangeably.

have found the arrest unlawful and Holder not guilty. However, that did not occur. The jury found Holder guilty of resisting or obstructing a peace officer. Thus, Heck bars Holder's § 1983 claim because a successful prosecution of Holder's excessive force claim would necessarily imply that the police officers used unreasonable force and, therefore, Holder's criminal conviction for resisting or obstructing a peace officer was wrongful. Accordingly, the court grants the defendants' motion for summary judgment on Count I of Holder's amended complaint.

*Id.* at 939 (internal citations omitted).

Similarly, *Loveday v. Village of Villa Park*, No. 02-C-6549, 2004 WL 1878837 (N.D. Ill. Aug. 17, 2004) (Der-Yeghiayan, J.), found *Heck* to bar an excessive force claim where the plaintiff had been convicted of resisting arrest. In relevant part, the police officer defendant claimed that he sprayed the plaintiff with pepper spray because the plaintiff was being uncooperative and belligerent and was refusing to extend his arms and submit to arrest. *Loveday*, 2004 WL 1878837, at *1. *Loveday* held that the plaintiff could not "contest the lawfulness of the pepper spray incident [because] Loveday was convicted in state court for resisting arrest. Therefore, he cannot now challenge the lawfulness of the conviction in this Section 1983 action." *Id.* at *5 (citing *Heck*, 512 U.S. at 486-87).

Other cases, however, have refused to find a *Heck*-bar in cases where a plaintiff who was previously convicted of resisting arrest (or resisting a peace officer) later filed a lawsuit alleging excessive force against the police officers who arrested him. For example, in *Gregory v. Oliver*, 226 F. Supp. 2d 943, 947 (N.D. Ill. 2002) (Shadur, J.), the plaintiff was arrested for possession of drug paraphernalia. In the midst of the arrest, the plaintiff fell with a police officer onto a couch and, once there, was punched and beaten by a stick. *Gregory*, 226 F. Supp. 2d at 947. After being handcuffed, defendants alleged that the plaintiff tried to kick the officer, and another officer responded by pulling the plaintiff down by the handcuffs, which eventually resulted in the

plaintiff's ankle breaking. *See id.* at 947. Judge Shadur refused to grant summary judgment based on the defendant's claim that under *Heck* the plaintiff's guilty plea to charges of resisting arrest barred the excessive force claim:

> But that suggested one-to-one correlation between (1) a conviction for resisting arrest or aggravated assault and (2) the absence of a viable claim of excessive force is simply nonexistent. It is apparent that in some instances a Section 1983 claim does not contradict the events that resulted in a plaintiff's convictions--two obvious examples would be an officer's unjustified imposition of excessive force in an overreaction to an arrestee's assault, or the imposition of excessive force after the event that led to a resisting-arrest conviction.

*Id.* at 952 (internal citations omitted).

Likewise, *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107 (N.D. Ill. 1997) (Hart, J.), ruled that "under the facts of the present case, a finding of excessive force is not necessarily inconsistent with the validity of DuFour-Dowell's resisting arrest conviction. *Heck* does not bar DuFour-Dowell's excessive force claim." *DuFour-Dowell*, 969 F. Supp. at 1118. In *DuFour-Dowell*, the defendant police officers attempted to serve an arrest warrant (for obstruction of a police officer) on the plaintiff at approximately 12:30 in the morning. *See id.* at 1110. Apparently, the plaintiff did not submit to arrest quietly, and she was thereafter also charged with (and later only convicted of) resisting arrest. *See id.* at 1111. The plaintiff filed suit, alleging, among other claims, that she was subjected to excessive force during her arrest. The defendants moved for summary judgment, claiming that *Heck* barred the plaintiff's claim. *See id.* at 1115. The district court rejected that argument because "the jury was not required to specify on what basis it found DuFour-Dowell guilty of resisting arrest, so the jury "could have found that the acts of resisting arrest occurred subsequent to and not in direct relation to any excessive force." *Id.* at 1118. Consequently, self-defense to excessive force would not have been a defense to the

conviction, because "the circumstances of the criminal conviction do not permit a determination as to the pertinent facts found by the jury." *Id.* at 1118. Thus, the plaintiff's excessive force claim was not *Heck*-barred. *See id.* at 1118.

The Court need not attempt to resolve any tensions in the caselaw to resolve this issue in Plaintiff's favor in this case. First, more general Seventh Circuit teaching instructs that whether a particular claim in *Heck*-barred turns on whether the plaintiff's actual claim as framed by the facts alleged would be inconsistent with the underlying state court criminal conviction. Specifically, in *Okoro v. Callaghan*, 324 F.3d 488 (2003)—which was not an excessive force case, but the same principles would seem to apply—the Seventh Circuit instructed that a putative plaintiff's civil claim is *Heck*-barred at least to the extent that any allegations he makes would imply the invalidity of his prior criminal conviction. *Id.* at 490. In this regard, a district court should not proceed in the abstract, trying to see whether there is a "theoretical possibility" that one might posit a set of facts in which the plaintiff's civil claim and the existing criminal conviction could stand together. *Id.* Instead, the key is that *Heck* bars, at a minimum, "allegations that are inconsistent with the conviction's having been valid." *Id.*

If one takes a fact-sensitive assessment of the *Heck*-issue in this case in relation to the resisting a peace officer conviction, it appears reasonably clear that Trejo could prevail on at least some of his factual allegations without undermining or calling into question the legitimacy of his state court criminal conviction. Even if a resisting-arrest conviction might invalidate an excessive force claim relating to force used in effecting the arrest—because under Illinois law, a criminal defendant may claim self-defense through justifiable use of force to a charge of resisting

arrest if an officer uses excessive force in effecting that arrest[11]—the conviction for resisting

arrest would not necessarily undermine a claim of excessive force for police officers' actions that

occurred *after* Plaintiff was arrested.  Plaintiff alleges multiple occurrences amounting to

excessive force—some of which appear to have occurred after he was arrested.  Therefore, at a

minimum, based on Plaintiff's factual allegations, he could prevail on at least some excessive

force claim.[12]

Second, the fact that Judge Marovich previously reject Defendants' *Heck* argument is

material.  Defendants' request for this Court effectively to reverse Judge Marovich's prior ruling

implicates a "variant of the law of the case doctrine that relates to the re-examination of a prior

ruling by a different member of the same court."  *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th

Cir. 1997).  Precedent teaches that "the presumption [in] such cases is that earlier rulings will

stand."  *Id.*  While presumptions are rebuttable, of course, Defendants have not presented a

sufficient basis to depart from Judge Marovich's prior ruling concerning the issue of a potential

*Heck*-bar to Plaintiff's excessive force claim.  Judge Marovich took a decisive stand on the *Heck*-

bar issue, stating that "[i]t is possible, under the language of this statute, that an officer could use

---

[11] *See People v. Bailey*, 439 N.E.2d 4, 9 (Ill. App. 1982) ("In Illinois, an individual may
not use force to resist an arrest which he or she knows is being made by a peace officer, even if
he or she believes that the arrest is unlawful and it is in fact unlawful. *This rule is qualified,
however, in that it does not apply to a situation in which an officer uses excessive force.*  The use
of excessive force invokes the right of self-defense.") (emphasis added; internal citations
omitted).

[12] It is difficult to see how a resisting arrest or resisting a peace officer conviction could
bar any and all potential claims for excessive or unlawful use of force.  For example, if a drunk in
a bar scuffled with police officers who came to arrest him, he might well be convicted of
resisting arrest.  However, it would not be reasonable to read that conviction as barring the
hypothetical contention that the officers beat up the arrestee at the police station hours after the
arrest in retaliation. *Accord Gregory*, 226 F. Supp. 2d at 952.

excessive force in response to, and despite, a plaintiff's resisting arrest." *Trejo v. Village of Itasca*, No. 02-C-1193, 2003 WL 22922152, at *2 (N.D. Ill. Dec. 10, 2003). Judge Marovich concluded that "it is not evidence that if Trejo prevails, this result would necessarily render the [sic] his conviction for resisting arrest invalid." *Id.* at *2. In the absence of further guidance from the Seventh Circuit on this precise issue, Judge Marovich's prior assessment is at least generally consistent with that of at least two other members of this court, and Defendants do not offer any sufficiently compelling argument to depart from the earlier ruling in this case.[13] As a result, Defendant Pearson's motion for summary judgment on Plaintiff's claim of excessive force is denied.

C.      Count I: §1983 Claim for Failure to Train

Defendant Itasca maintains that it cannot be held liable for any alleged misconduct of its police officers in the instant case, since no dispute of material fact exists that would suggest the misconduct was undertaken pursuant to a policy or practice of the Itasca Police Department to fail to train, supervise, or control its officers. (D.E. 53 at 15.) Plaintiff contends that the failure to train claim should not be dismissed, because factual questions regarding the adequacy of the officers' training remain. (D.E. 64 at 16.)

---

[13] This Court has effectively rejected Judge Marovich's prior assessment that Trejo's 2002 complaint "related back" to the 2000 "notice of removal" so as to save state law claims from the statute of limitations applicable under Illinois law. As this Court has previously explained in its opinion of April 15, 2004 (D.E. 47 at 6-10), and as this Court explains again today (*see supra*) this Court has not located any authority supporting Judge Marovich's assessment on the "relation back" issue and has located considerable authority contradicting it. In addition, Trejo also has not provided any authority addressing an analogous circumstance that supports a "relation back" finding. As a result, the circumstances surrounding Judge Marovich's "relation back" assessment (which this Court respectfully rejects), and Judge Marovich's assessment of the *Heck*-bar question (which this Court adheres to), are materially different.

A local government "may not be sued under Section 1983 for an injury inflicted solely by its employees or agents." *Arlotta v. Bradley Ctr.*, 349 F.3d 517, 522 (7th Cir. 2003). In this regard, *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), teaches that municipalities are liable under Section 1983 only when it can be shown that the municipality, in executing its official policy or practice, has *caused* the constitutional violation. *Id.* at 64; *accord, e.g., Arlotta*, 349 F.3d at 521-22 ("Significantly, a plaintiff must show a direct causal link between the municipal policy and the constitutional deprivation. The policy or custom must be the moving force behind the alleged constitutional deprivation.") (internal quotation marks and citations omitted); *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994) ("§ 1983 states that liability will attach only when a governmental entity *causes* the violation, and proceeding against a municipality under a theory of *respondeat superior* falls short of establishing this level of causation.") (citing *Monell*, 436 U.S. at 692-94; emphasis in original). To ensure "that isolated instances of misconduct are not attributable to a generally adequate police or training program, [the Seventh Circuit] require[s] a high degree of culpability on the part of the policymaker." *Cornfield*, 991 F.2d at 1327. Culpability, combined with the causation requirement, teaches that "liability [must] be based on a finding that the policymakers have actual or constructive notice that a particular omission is likely to result in constitutional violations." *Id.* Given this strict framework, "an allegation of 'failure to train' is available only in limited circumstances." *Palmquist v. Selvik*, 111 F.3d 1332, 1344 (7th Cir. 1997) ("Taken together, these two considerations amount to a requirement that liability be based on a finding that the policymakers have actual or constructive knowledge that a particular omission . . . is likely to result in constitutional violations.") (citing *Cornfield*, 991 F.2d at 1327).

28

Plaintiff is claiming municipal liability under Section 1983 based on an omission—in this case, a failure to train. To prove a claim of failure to train, a party must prove that the failure caused the violation. "To prove causation, . . . [a plaintiff] must demonstrate that this omission evidences 'a deliberate choice to follow a course of action . . . from among various alternatives by city policymakers.'" *Hirsch*, 40 F.3d at 903 (quoting *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)). The omission will yield liability where the failure to train is so great that it amounts to "deliberate indifference to the rights of people with whom the police come into contact." *Hirsch*, 40 F.3d at 904 (citing *Harris*, 489 U.S. at 389); *see also id.* (stating that plaintiff needed "to show that the defendants were on notice of a pattern of constitutional violations resulting from the inadequate training of the police . . . .").

Deliberate indifference may be shown in one of two ways. *See Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003). First, a municipality shows indifference when it fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation. *See id.* (citing *Bd. of Cty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)). Second, a municipality will be held to have been deliberately indifferent if it fails to provide further training after learning of a pattern of constitutional violations by the police because of inadequate training. *See Palmquist*, 111 F.3d at 1346.

In the instant case, Plaintiff has made no mention of (or offered any evidence of) a pattern of prior constitutional violations which might have resulted from inadequate training, or any policy or practice of committing such violations. Hence, Plaintiff's claim of Itasca's "deliberate indifference" must be based on a failure to train employees to handle a recurring situation with an

obvious potential for a constitutional violation. When analyzing the level of training in a recurring situation allegation, "the focus must be on the program, not whether the particular officers were adequately trained." *Palmquist*, 111 F.3d at 1345 (citing *City of Canton*, 489 U.S. at 390-31). In determining the adequacy of training, the Court must make sure not to "ignore the training the officers did receive from other sources, including the police academy." *Manzella v. Village of Bridgeview*, No. 01-C-8202, 2004 WL 1794923, at *6 (N.D. Ill. Aug 6, 2004) (quoting *Palmquist*, 111 F. 3d at 1345).

Plaintiff contends that Itasca's training of the police officers sent to arrest him was inadequate, because at the date of the arrest, Officers Pearson and Kauther had not been trained in the use of force in six years, and Sergeant Moersch "does not appear to have ever received any training specifically and exclusively dedicated to the use of force." (D.E. 64 at 16.) Essentially, this claim boils down to an allegation that the Village of Itasca showed deliberate indifference by failing to provide adequate training regarding the use of force. However, Plaintiff appears to ignore the training the officers did receive. Plaintiff does not dispute the extensive training Defendants obtained in myriad post-academy seminars (D.E. 55, Exhibit R) relevant to using force when placing a party under arrest (even if not "specifically and exclusively dedicated to the use of force"), and he appears to ignore the training the officers received from the police academy (D.E. 54 ¶ 56) and other sources. Moreover, Plaintiff has not pointed to any facts regarding any deficiency in Itasca's training program that officers receive in the application of force during an arrest, other than apparently that it is supposedly not frequent enough. *See Manzella*, 2004 WL 1794923, at *6. But Plaintiff does not even suggest what frequency of training would in his view be more appropriate or suggest how the current frequency of the

training is inadequate. Likewise, Plaintiff makes no meaningful argument as to any purported

deficiencies in the content of Itasca's training program—other than Plaintiff's apparent

willingness to mock training that the officers received in other subjects such as leadership

development and what appears to be communications skills. Simply, Plaintiff has not alleged

that anything that Itasca has either done or failed to do in terms of training its officers in the use

of force rises to the level of deliberate indifference, nor that Itasca had any notice, real or

constructive, that its training (or lack thereof) was likely to result in constitutional violations.

Moreover, even if one takes as true Plaintiff's version of "the single incident at issue in this

case," there is nothing about the alleged altercation that makes any "lack of training so obvious,

and any [alleged] inadequacy therein so likely to result in a violation of constitutional rights,"

that Itasca can "be said to have been deliberately indifferent to a purported need." *Palmquist*,

111 F.3d at 1347 (7th Cir. 1997).

Simply put, Plaintiff provides no meaningful evidence implicating Itasca or its police

force on the failure to train claim. Defendant Itasca's motion for summary judgment as to

Plaintiff's failure to train claim is therefore granted.

D.      Count IV: §1983 Claim for Unlawful Arrest/Unlawful Seizure

Finally, Defendants allege that probable cause did exist under a valid arrest warrant such

that the arrest of Plaintiff was lawful. (D.E. 53 at 9, 10-11.) Alternatively, Defendants maintain

that even if there is a factual issue regarding the existence of probable cause, Defendants enjoy

qualified immunity from lawsuit in this case. (*Id.* at 9) In response, Plaintiff asserts that Officer

Pearson should enjoy neither complete nor total immunity, since he lacked probable cause for the

arrest and acted pursuant to a warrant that a reasonably trained officer would have known was

inappropriate under the circumstances. (D.E. 64 at 8-10.)

The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). If a plaintiff can establish that he has suffered a constitutional violation, a court then examines whether the right was clearly established. *See id.* As the Supreme Court explained in *Saucier*, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Id.* at 206.

As a general rule, a plaintiff cannot base a Fourth Amendment claim on an arrest made pursuant to a valid warrant. *Baker v. McCollan*, 443 U.S. 137, 143-44 (1979); *accord, e.g., Neiman v. Keane*, 232 F.3d 577, 579 (7th Cir. 2000). In this regard, irrespective of any alleged motives of a defendant-officer towards a particular plaintiff, the existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest. *See, e.g., Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir.1985) (citing *Terket v. Lund*, 623 F.2d 29, 31 (7th Cir.1980)). The mere existence of a warrant is not an automatic bar against suit—because, for example, a warrant may be clearly defective on its face. Nonetheless, in this regard, "the officer procuring the warrant is immune from a suit for damages unless it can be shown that the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Neiman*, 232 F.3d at 579-80 (internal quotation and citation omitted). In addition, if the finding of probable cause embodied in the warrant is based on the defendant's intentional misrepresentation or concealment of material facts, the plaintiff may be able to proceed on a Fourth Amendment claim challenging the reasonableness of an arrest. *Schertz v. Waupaca County* 875 F.2d 578, 582 (7th Cir. 1989); *accord Neiman*, 232 F.3d at 580.

32

Plaintiff at no point accuses Officer Pearson of intentional misrepresentation or concealment of facts. What Plaintiff does allege is that Officer Pearson harassed him (D.E. 64 at 9) and that the warrant was inappropriately granted because Ms. Galvez's complaints did not allege all three necessary elements to a disorderly conduct charge.[14] (*Id.* at 8.) Consequently, Plaintiff is forced to rely on his argument that Officer Pearson is not immune from suit for his conduct because the warrant was issued under circumstances that "a reasonably trained officer should have known was inappropriate." (D.E. 64 at 8.)

Once a police officer defending a claim of false arrest "moves for summary judgment on the ground that his actions were supported by probable cause and submits that a duly authorized judicial officer found probable cause, the defendant has necessarily put probable cause at issue, and the plaintiff must thus come forward and show that there is an issue of fact as to the existence of probable cause to survive summary judgment." *Simmons v. Pryor*, 26 F.3d 650, 653 (7th Cir. 1993). Probable cause is "a commonsense determination, measured under a reasonableness standard, and is present if at the time of the arrest the facts and circumstances within the arresting officer's knowledge and of which [h]e has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was

---

[14] In Illinois, the offense of disorderly conduct, codified at 720 Ill. Comp. Stat. 5/26-1(a)(1), includes three elements. The individual's conduct must "(a) be unreasonable, (b) disturb or alarm another, and (c) threaten to provoke or provoke a breach of the peace." *Biddle v. Martin* 992 F.2d 673, 677 (7th Cir. 1993). As those familiar with law enforcement know well, the disorderly conduct charge is used to successfully prosecute a wide variety of menacing and other anti-social misconduct—typically when it does not produce more serious harm such as an assault and battery. *See id.* (stating that "the types of conduct that may be disorderly conduct 'almost defy definition.' Whether particular conduct is disorderly therefore depends not only on the conduct itself but also on the conduct's unreasonableness in relation to the surrounding circumstances." (quoting *Lester v. City of Chicago*, 830 F.2d 706, 714 (7th Cir. 1987)).

committing an offense." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) (internal

punctuation and citations omitted). The complaint of a single witness or putative victim alone

generally is sufficient to establish probable cause to arrest unless the complaint would lead a

reasonable officer to be suspicious, in which case the officer has a further duty to investigate.

*See Beauchamp v. City of Noblesville, Ind.* 320 F.3d 733, 743 (7th Cir. 2003) (collecting cases);

*Spiegel*, 196 F.3d at 723 ("[A]s long as a reasonably credible witness or victim informs the police

that someone has committed, or is committing, a crime, the officers have probable cause to place

the alleged culprit under arrest, and their actions will be cloaked with qualified immunity if the

arrestee is later found innocent.") (internal quotation marks and citation omitted). The Court

evaluates probable cause "not on the facts as an omniscient observer would perceive them but on

the facts as they would have appeared to a reasonable person in the position of the arresting

officer—seeing what he saw, hearing what he heard." *Booker v. Ward*, 94 F.3d 1052, 1057-58

(7th Cir. 1996). Generally, whether there is probable cause is a jury question, but "when there is

no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn

from them," a court may decide the issue. *Id.* at 1058.

Following the *Simmons* directive, this Court must first ascertain whether the Defendant

claims that his actions were supported by probable cause and submits that a duly authorized

judicial officer found probable cause. Defendant argues, at length, the existence of probable

cause in the issuance of the warrant and his actions as a part of obtaining the warrant and

executing it. (D.E. 53 at 10-11.) He also argues that the warrant was duly issued by Judge

Minton (*id.* at 11) after receiving Ms Galvez's signed complaint and speaking with Ms. Galvez

personally. (D.E. 54 ¶ 20-21.) Consequently, the Court holds that the Defendant has put

probable cause at issue, and it is now up to the Plaintiff to "come forward and show that there is an issue of fact as to the existence of probable cause." *Simmons*, 26 F.3d at 653.

It is unclear exactly how Plaintiff attempts to allege the lack of probable cause. He notes the facts that all conversations between Ms. Galvez and Plaintiff occurred in the bank, during normal business hours, and were of the "regular business type." (D.E. 64 at 9.) While these statements maybe could go towards undermining Ms. Galvez's credibility, they do not take away from the fact that she made specific and damning allegations in her duly filed complaint:

> Defendant knowingly told Jessica Galvez that he heard that she had been a victim of a kidnapping and rape and then asked her if she had a boyfriend, has sent numerous correspondence [sic] to the Itasca Bank and Itasca Police Department stating that he is her fiancé . . . and has the right to protect her even if he has to use deadly force, and has been asked to leave the bank for causing disturbances while Jessica Galvez was working.

(D.E. 55, Exhibit J.) Furthermore, Plaintiff alleges generically that the warrant lacked probable cause because "Plaintiff's conduct did not provoke or threaten to provoke a breach of the peace." (D.E. 64 at 10.) Presumably this stems from Plaintiff's related assertion that "Ms. Galvez never alleged nor was Defendant Pearson aware that Plaintiff had ever made any physical threats against her." (*Id.* at 9.) Such a position, however, is clearly erroneous. In her complaint, Ms. Galvez alleged that "Trejo has done this in such an unreasonable manneras [sic] to alarm and disturb Jessica Galvez, and provoke a breach of the peace." (D.E. 55, Exhibit J.) Plaintiff has admitted that these allegations existed in Ms. Galvez's complaint. (D.E. 63 at 2.) No reasonable adult could read the sworn allegations in Ms. Galvez's complaint (even putting entirely aside the bizarre statements and menacing intimations in Trejo's letters to local businesses and law enforcement authorities that Trejo acknowledges writing) and not have an immediate sense that Trejo was an unstable and dangerous individual whose statements and actions constituted a threat

to Ms. Galvez and the peace of the community generally.

Trejo also perhaps suggests that Ms. Galvez might not be credible, or that the police officers may have overreacted to her allegations. The Court respectfully disagrees. As to credibility, Ms. Galvez would be considered a model witness for the prosecution—in comparison to, for example, numerous familiar witnesses such as rival gang members, paid informants, and cooperating defendants attempting to earn leniency in return for their testimony. Any attack on Ms. Galvez's credibility also rings hollow in light of the documentary evidence in the case that Trejo admits to writing at approximately the same time as Ms. Galvez's complaints—documentary evidence that corroborates her testimony in substantial part. In any event, Officer Pearson was not required to assess whether the complainant's testimony was beyond question or reproach; instead, he was required not to obtain the arrest warrant or to execute it if it was clearly without foundation. Trejo does not come close to passing that hurdle.

Finally, Plaintiff appears to suggest that Officer Pearson harassed Plaintiff prior to Ms. Galvez's filing a complaint. (D.E. 64 at 9.) This allegation appears to rest on the idea that it was objectionable for Officer Pearson to tell Trejo to leave Ms. Galvez alone when no judicial restraining order was in place at the time. This argument appears misplaced for at least two reasons. First, Trejo offers no authority for the counterintuitive proposition that street officers are prohibited from instructing a member of the community to cease from engaging in behavior that clearly appears to be the subject of reasonable anxiety on the part of putative a victim-citizen like Ms. Galvez. This is particularly true given that, according to by all appearances (and contemporaneous documentary evidence Trejo concedes to have written, in addition to Ms. Galvez's testimony), Trejo presented a picture of an unstable individual variously referencing

"rape" and "deadly force" in the course of interacting with Ms. Galvez. Second, and independently, Trejo's allegation of harassment is irrelevant to the instant case. Plaintiff has not alleged a harassment complaint; harassment is neither an element of nor a mitigating factor for a disorderly conduct charge; and any alleged harassment does not have any impact on the existence of probable cause for the arrest, because all probable cause came from Ms. Galvez's sworn statement and Judge Minton's issuance of a warrant for Plaintiff's arrest. *Accord Mark*, 769 F.2d at 1269 (alleged motives of officer procuring warrant are irrelevant if probable cause for arrest exists).

Since Plaintiffs have failed to show that there is a difference of opinion as to an issue of fact relevant for determining probable cause, the Court holds that probable cause did exist for the warrant. Furthermore, the warrant was valid and amply supported by probable cause for its issuance. As a result, Officer Pearson enjoys qualified immunity from Plaintiff's Section 1983 unlawful arrest claim. Therefore, the Court grants Defendants' motion for summary judgment as to Count IV of Plaintiff's complaint.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants' motion for summary judgment is granted in part and denied in part.  The Court grants summary judgment for Defendants on Counts II-VI and denies summary judgment on Count I as against Defendant Pearson only.  All claims against the Village of Itasca are dismissed.

So Ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Dated: _11-15-04_